## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 20-mj-8265-TJJ |
| | ) |
| MIGUEL A. PIZARRO | ) |
| and | ) |
| BRIAN PIZARRO, | ) |
| | ) |
| Defendants. | ) |

## CRIMINAL COMPLAINT

I, Jakob Blackman, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## COUNT 1

Beginning on or about October 28, 2020, and continuing to on or about November 10, 2020, in the District of Kansas and elsewhere, the defendants,

**MIGUEL A. PIZARRO**
**and**
**BRIAN PIZARRO,**

Conspired to travel in interstate commerce from Kansas City, Kansas to Springfield, Missouri, with the intent to commit a contract murder in violation of the laws of the State of Missouri, as consideration for the receipt of and as consideration for a promise and agreement to pay money.

All in violation of Title 18, United States Code, Section 1958.

## STATEMENT OF FACTS

I, Jakob Blackman, am a law enforcement officer with the Kansas City, Kansas Police Department (KCKPD). I started my career with KCKPD as a patrolman in October 2011. Prior to my service with the KCKPD, I worked for the Leavenworth Sheriff's Office from September 2010 to October 2011. Before commencing my law enforcement career, I earned a bachelor's degree in Law Enforcement/Justice Administration from Western Illinois University and later earned a Master's Degree in Criminal Justice from the University of Central Missouri. In July 2016, I became a detective with the Kansas City Kansas Police Department. I worked two years in the KCKPD Gang Unit working various gang-related investigations. I am currently assigned to the Alcohol, Tobacco, Firearms and Explosives (ATF) as a task force officer (TFO). I have investigated a variety of crimes that range from property crimes, narcotics investigations, crimes against persons, and homicides. During the course of my employment, I have received training and have participated in numerous investigations which led to the prosecution of suspects. I have received training in criminal investigations and my duties include the investigation of federal firearms violations. During the course of my employment, I have been directly involved in numerous investigations which led to the prosecution of suspects for the unlawful use and possession of firearms.

1. The United States, including ATF, is conducting a criminal investigation of **Miguel A. Pizarro** and **Brian Pizarro**, regarding possible violations of 18 U.S.C. § 1958 (use of interstate commerce facilities in the commission of murder-for-hire) and § 2 (aiding and abetting).

2. Commencing on or about June 10, 2020, an ATF undercover agent (referred to as "ATF UC") utilized (913) 689-0215 to contact **Miguel A. Pizarro.** During the telephonic contact, the ATF UC and **Miguel A. Pizarro** scheduled a meeting for June 18, 2020.

2

3. On June 18, 2020, the ATF UC and a CI met with **Miguel A. Pizarro** and Enrique Talamantes (both documented F-13 gang members). During the meeting, the ATF UC agent purchased a firearm (a Glock, model 22 gen4, .40 caliber pistol, with serial number PZG800) from Talamantes after the transaction was coordinated by **Miguel A. Pizarro**.

4. On August 31, 2020, the ATF UC and a CI met again with **Miguel A. Pizarro**. The meeting was set up by **Miguel A. Pizarro** over a string of telephonic communications (via **Miguel A. Pizarro's** (913) 689-0215 number). During these communications, the CI and **Miguel A. Pizarro** exchanged three photographs, 29 text messages, and six telephone calls. The CI recognized the person he/she communicated with as **Miguel A. Pizarro.** During the meeting, the ATF UC purchased a firearm (a Smith and Wesson, M&P45, .45 caliber pistol, with serial number HAB3063) from **Miguel A. Pizarro**. During the interaction, **Miguel A. Pizarro** discussed being "Locs" (sic), referring to a name of a gang. The term "Locs" is believed to be one of two main sets within the criminal street gang Florencia 13 (commonly referred to as "F-13"). F-13 is split between two sets, known as the "Neighborhood" set and "Locotes" set. **Miguel A. Pizarro** also discussed his involvement in a shooting near Central and Orville in Kansas City, Kansas. **Miguel A. Pizarro** claimed the other people belonged to the "Traviesos" or TVS gang.

5. On October 6, 2020, **Miguel A. Pizarro**, using (913) 689-0215, called the ATF UC and the two arranged a subsequent deal for October 9, 2020. On October 9, 2020, the ATF UC contacted **Miguel A. Pizarro**, via (913) 689-0215, to coordinate the meeting. Thereafter, the ATF UC met with **Miguel A. Pizarro** at the Sun Fresh grocery store parking lot, 241 S. 18th Street, Kansas City, Kansas. During the meeting, the ATF UC purchased two firearms from **Miguel A. Pizarro** (a HS Produkt (Springfield Amory U.S.A.), XD-45ACP, .45 caliber pistol, with serial number MG688192; and a Glock, model 19 Gen 4, 9mm pistol, with serial WHK692).

3

A second ATF agent, also working undercover, accompanied the UC during this transactions. This second ATF agent did not involve himself/herself in the interactions or transaction with **Miguel A. Pizarro.**

6. During the interaction with the ATF UC, **Miguel A. Pizarro** said he committed a homicide in Kansas City, Kansas with one of the firearms he sold to the ATF UC. Investigators, utilizing law enforcement databases, identified the homicide **Miguel A. Pizarro** described. ATF TFO Blackman spoke with Kansas City, Kansas Police Department (KCKPD) homicide detectives. ATF TFO Blackman learned that on September 26, 2020, KCKPD officers responded to 4400 Adams Street, Kansas City, Kansas on reports of a shooting. The victim, identified as Luis Velasquez-Chavez (H/M, 07-01-2005), was transported to the University of Kansas Medical Center, where he later died from his injuries. Officers recovered .45 caliber casings from the scene. Homicide detectives believed Luis Velasquez-Chavez had just exited the driver's seat of a vehicle when he was shot and later killed. During the subsequent autopsy, two .45 caliber bullets and one .9MM bullet were removed from Velasquez-Chavez's body. **Miguel A. Pizarro** told the ATF UC he shot the victim in a car and fired in the car door. Photographs from the crime scene show at least four bullet holes in the driver's side door of the victim's vehicle. **Miguel A. Pizarro** said the person he killed was the one who shot his brother back around May (2020). TFO Blackman later located an incident (report) from May 24, 2020 and learned **Brian Pizarro** (Miguel's brother) was shot in a vehicle along with two other individuals. The reports reflect that Rey Villalobos (H/M, DOB: 6-06-2002) was killed in the incident. KCKPD reports indicate **Brian Pizarro** was shot in his left shoulder, left quad, and left calf. **Brian Pizarro** eventually recovered from his injuries.

7. The ATF was able to conduct preliminary ballistic casing testing on the firearms the ATF

4

UC purchased from **Miguel A. Pizarro** (a HS Produkt (Springfield Amory U.S.A.), XD45ACP, .45 caliber pistol, with serial number MG688192; and a Glock, model 19 Gen 4, 9mm pistol, with serial WHK692). The preliminary results, from the purchased HS Produkt .45 caliber pistol, matched the discharged .45 caliber casings recovered from the September 26, 2020 homicide.

8. On October 26, 2020, the ATF UC called (913) 689-0215 and asked **Miguel A. Pizarro** if he (**Pizarro**) had someone he trusted more than anyone. **Miguel A. Pizarro** said he had his brother. The ATF UC and **Miguel A. Pizarro** scheduled a meeting for October 28, 2020 to discuss a possible job. On October 28, 2020, the ATF UC met with **Miguel A. Pizarro** and another Hispanic male, believed to be **Brian Pizarro** (DOB: 9/9/2001). **Brian Pizarro** is also a known F-13 gang member and is familiar to the KCKPD Gang Unit. Investigators believe **Brian Pizarro** and **Miguel A. Pizarro** are brothers. Both **Miguel** and **Brian Pizarro** have used the same home address in past Wyandotte County Detention Center booking records. During the meeting, the ATF UC informed both subjects the ATF UC was looking for someone capable of performing an execution that looked like a robbery. Both **Miguel Pizarro**, and the individual believed to be **Brian Pizarro**, agreed and said they were the ones for the job.

9. **Brian Pizarro** discussed his involvement in an August 25, 2020 homicide. The ATF UC asked how he did it. **Brian Pizarro** said they (**Brian** and unknown associates) were arguing with another group of individuals near the area where **Brian** lived. **Brian Pizarro** said "they" (referring to the victims) were some guys "they" (**Brian** and his unknown associates) did not get along with. **Brian Pizarro** said it got to a point where "one of us is going to have to do something." **Brian Pizarro** said one of the victims backed away, turned around, and started walking while the other victim was still talking shit. **Brian Pizarro** said he had a Glock with a beam on it and started "dumping" (shooting) at one guy and then the other guy in the back. **Brian**

**Pizarro** said he (**Brian Pizarro**) shot the guy who was paralyzed all in the body. **Brian** said he shot the guy who died in the back. **Brian Pizarro** said they (the victims) were separated from each other by about ten feet. Brian Pizarro said they (referencing the police) did not have suspects. **Brian Pizarro** said that was the only "one" (murder) he had done. **Brian Pizarro** told the ATF UC, "Luis . . . Bro did that." The ATF UC interpreted this statement as "Luis [referring to Luis Velasquez-Chavez] . . . Bro (meaning **Miguel Pizarro**) did that" (referencing **Miguel's** September 26, 2020 shooting and Luis Velasquez-Chavez's subsequent death).

10. At one point during the encounter, **Brian Pizarro** handed the ATF UC his (**Brian's**) smart phone, which displayed a news article about the August 25, 2020 murder. The ATF UC read the story aloud, as the ATF UC was recording the interactions. The article indicated the murder occurred in early morning hours. **Brian Pizarro** said the shooting actually took place around 2:00 a.m., but they didn't find the victim until 7:00 a.m.

11. Based on **Brian Pizarro's** description, ATF TFO Blackman spoke with KCKPD homicide detectives about the August 25, 2020 incident. ATF TFO Blackman learned there were possibly three suspects and two of the three were in custody and charged with the homicide. Investigators had no suspect information on the possible third suspect. On August 25, 2020, at approximately 12:43 a.m., KCKPD officers responded to the 900 block of S. 11th Street, Kansas City, Kansas, on reports of a shooting. Upon arrival, officers located Nestor Gutierrez (H/M, DOB: 12-03-2002) suffering from a gunshot wound to the chest and groin. Gutierrez was later partially paralyzed from his injuries. Investigators located multiple spent shell casings at the crime scene. On August 25, 2020, at approximately 6:24 a.m., officers were re-dispatched to the area, as someone discovered a deceased male's body in an alley. While searching the area close to Nestor Gutierrez's shooting scene, officers located Cristian Ramos-Quezada's body (H/M, DOB: 9-06-

2001) in a nearby alley. Ramos-Quezada suffered a fatal gunshot wound to the back.

12.     Evidentiary information, derived from the scene, corroborate **Brian Pizarro's** admission and description to the ATF UC. Based on a review of the incident's police reports, witnesses described an argument prior to the shooting (consistent with **Brian Pizarro's** story). **Brian Pizarro** also described how the victims were shot (one victim fell and the other was shot in the back). The police reports corroborated Nester Gutierrez was partially paralyzed and Cristian Ramos-Quezada had been shot in the back. Investigators believe Ramos-Quezada ran, or crawled, to the alley before he died.

13.     While interacting with **Miguel** and **Brian Pizarro**, the ATF UC provided a fictitious background story and told the two the ATF UC was not sanctioned to authorize the "hit." Consequently, the ATF UC said he/she had to find someone capable of performing an execution that looked like a robbery. **Brian Pizarro** said "they" were the people for that. The ATF UC said it was probably a two or three person job. **Miguel Pizarro** said they could do it, or they have someone else (referring to **Brian Pizarro's** 'cousin'). **Brian Pizarro** then said the name "Fredo" [sic]. **Miguel Pizarro** confirmed "Fredo" was the individual **Brian** referred to as his "cousin." The ATF UC told **Miguel** and **Brian Pizarro** that it (referring to the execution) was going to take some travel, as it would be carried out in Springfield (Missouri).

14.     The ATF said it had to be an execution that looked like a robbery. **Miguel Pizarro** asked if they were going to rob and kill him (the intended victim). The ATF UC said he/she didn't care; the ATF UC just needed his (the intended victim's) wallet. The ATF UC emphasized that "none of it" could come back to the ATF UC. **Brian Pizarro** said he didn't know the ATF UC's name and they were going to keep it like that.

15.     The ATF UC said he/she he did not know the intended victim personally. The ATF UC

7

told **Miguel** and **Brian Pizarro** that he/she would have them (**Miguel** and **Brian**) meet with a person in Springfield, Missouri. That contact person would then provide **Miguel** and **Brian Pizarro** with specific information about the person to be executed. When the ATF UC asked what compensation was appropriate, **Brian** and **Miguel Pizarro** said $10,000 (if it was the two of them) or $15,000 (if they brought a third person). The ATF UC said it was worth $10,000 - $12,000 for the job. The ATF UC told the two they would meet again next week to discuss the deal further. The ATF UC told them he/she planned to give them travel expenses during the next meeting. Throughout this investigation, the ATF UC recorded (both audio and video) the interactions with **Miguel** and **Brian Pizarro**

16.     On November 4, 2020, the ATF UC and **Miguel A. Pizarro** agreed to meet again to discuss the planned murder in Springfield, Missouri. They both communicated back and forth, via text and phone calls, using (913) 689-0215. At approximately 6:00 p.m., the ATF UC parked his/her vehicle in Frances Willard Elementary school parking lot at 3400 Orville Avenue, Kansas City, Kansas. After a few minutes, **Miguel A. Pizarro** and **Brian Pizarro** arrived on foot and entered the ATF UC's vehicle. **Miguel A. Pizarro** sat in the front passenger seat and **Brian Pizarro** sat in the back seat. The ATF UC asked if they were still willing to commit the murder. Both said they were. The ATF UC asked how they planned on carrying out the homicide. **Brian Pizarro** said they were going to kill the person from a distance and try to run up and get his wallet after the murder. **Brian Pizarro** said he was going to use his AR-15 rifle and a back-up Glock pistol. The ATF UC noticed **Miguel A. Pizarro** had a revolver-type firearm on his person. **Miguel** said he was planning to use the revolver. The ATF UC said the date of the murder would be the following Tuesday (November 10, 2020.) Both **Miguel** and **Brian Pizarro** agreed to the deal. The ATF UC paid **Brian Pizarro** $800.00 in U.S. currency as partial overall payment for the murder. **Brian**

**Pizarro** said they were going to purchase a stolen Dodge Durango from the neighborhood and use the vehicle to travel to Springfield, Missouri on Tuesday (November 10, 2020). The ATF UC told **Miguel A. Pizarro** he/she would communicate with **Miguel** at some point throughout the weekend and on Monday (November 9, 2020.) Both **Miguel** and **Brian Pizarro** agreed to a total payment of $10,000 for the murder and the final payment would be provided after they committed the murder.

17.     On November 9, 2020, at approximately 9:24 a.m., the ATF UC contacted **Miguel A. Pizarro** on (913) 689-0215 to ask if they were still good for tomorrow. **Miguel A. Pizarro** replied, "Yeah." The ATF UC told **Miguel A. Pizarro** to be in Springfield, Missouri at 11:00 or 11:30 a.m. the following day. The ATF UC requested **Miguel A. Pizarro** send him/her a picture of the car they would be in. **Miguel A. Pizarro** said he could send the ATF UC one later because, "it was put away" (referring to the vehicle). The ATF UC told **Miguel A. Pizarro** to text him/her when they were on the way down. As the conversation continued, the ATF UC told **Miguel A. Pizarro** to contact him/her after it was over and they could meet back in Kansas City, Kansas. The ATF UC said he/she would give them (**Miguel** and **Brian**) a ride home and pay them. **Miguel A. Pizarro** said, "Yeah, that's cool." The ATF UC asked if **Miguel A. Pizarro** wanted the ATF UC to send **Miguel** an address in Springfield where it was close to. **Miguel A. Pizarro** agreed.

18.     On November 9, at approximately 3:00 p.m., the ATF UC received a text from **Miguel A. Pizarro** on **Miguel's** (913) 689-0215 number. A few minutes later, the ATF UC received a call from (913) 689-0215. **Miguel A. Pizarro** asked to meet the ATF UC again because **Miguel** needed an additional $200.00 for ammunition. The two agreed to meet again at Frances Willard Elementary school, 3400 Orville Avenue, Kansas City, Kansas.

19.     At approximately 5:00 p.m., the ATF UC made contact with **Miguel A. Pizarro** and **Brian Pizarro** in a parking lot area of the school. The ATF UC twice told **Miguel A. Pizarro** and **Brian Pizarro** if they didn't want to carry out the murder it was okay. Both **Miguel A. Pizarro** and **Brian Pizarro** said they still were willing to do it. During the conversation, **Miguel A. Pizarro** said he had a Glock he was going to use. **Brian Pizarro** showed the ATF UC a revolver, believed to be the same revolver the ATF UC observed **Miguel A. Pizarro** with on November 4, 2020.

20.     On November 10, 2020, the ATF UC sent text messages to **Miguel's** (913) 689-0215 number, inquiring if they had left yet. **Miguel A. Pizarro** sent a series of texts to the ATF UC indicating he was on the way and said he was in a silver/gray Mitsubishi vehicle. The ATF UC texted **Miguel A. Pizarro** the address to meet at (417 S. Mill Street, Springfield, Missouri).

21.     At approximately 11:30 a.m., ATF members set up in preparation for the meet and arrest at 417 S. Mill Street, Springfield, Missouri. At approximately 12:15 p.m., another ATF UC (referred to as "ATF UC 2") was parked at the address awaiting contact with **Miguel** and **Brian Pizarro**. A silver Mitsubishi arrived and parked next to ATF UC 2's vehicle. ATF UC 2 exited his/her vehicle and was greeted by a Hispanic male, later identified as **Brian Pizarro**. ATF UC 2 observed **Brian** exit the Mitsubishi's rear driver side door. ATF UC 2 observed two additional males in the silver Mitsubishi. ATF UC 2 asked **Brian Pizarro** if he was "Bill's" associate and if the other two Mitsubishi occupants knew what was going on. **Brian Pizarro** replied, "Ya, they're gonna do the hit with me." At one point, ATF UC 2 asked **Brian Pizarro** if ATF UC 2 could enter the Mitsubishi. **Brian Pizarro** responded in the affirmative. ATF UC 2 then walked over, sat in the Mitsubishi's rear passenger seat, and conversed with the other three occupants. ATF UC 2 positively identified **Miguel Pizarro** as the Mitsubishi's driver. **Brian Pizarro** asked ATF UC 2

if he/she had a picture of the intended target. ATF UC 2 indicated he/she did not have a photograph, but provided a detailed description of the intended target. **Brian Pizarro** asked if the target would be the only individual coming in/out of the house. ATF UC 2 said the intended target had a puppy that often required walking outside. **Brian Pizarro** asked how often the dog needed to be walked. ATF UC 2 said about every hour. The Mitsubishi's occupants then discussed driving arrangements to the target's residence. **Miguel Pizarro** said, "Yeah, let's go with [ATF UC 2] so we can scope it out." ATF UC 2 said the three individuals could ride with him/her in ATF UC 2's vehicle, observe the target residence, and then ATF UC 2 would then drive them back. **Brian Pizarro** then replied, "Then, we do our shit. Yeah, my gun's in the trunk. I got my chop." Based on training, experience, and knowledge of firearm-related investigations, your affiant knows the term "chop" is street vernacular for a "chopper" (a high-caliber rifle). ATF UC 2 and **Brian Pizarro** then exited the Mitsubishi. ATF UC 2 paused and spoke with the Mitsubishi's front seat passenger, tentatively identified as **Alfredo Aguilera** (DOB: 10/11/01). ATF UC 2 observed a silver revolver in **Aguilera's** lap.

22. Thereafter, ATF personnel converged on the area and arrested the Mitsubishi's three occupants. **Brian Pizarro** was taken into custody outside of the vehicle. The driver (**Miguel A. Pizarro**) and front passenger (**Alfredo Aguilera**) were also taken into custody from the Mitsubishi. ATF investigators observed a stainless steel revolver to the right lower area (outside) of the Mitsubishi's front passenger seat. This appeared to be the same firearm ATF UC 2 observed on **Alfredo Aguilera's** lap moments before the takedown. After the arrest team opened the Mitsubishi's trunk, they located what appeared to be an AR-15 style rifle.

23.     Investigators identified this rifle as a Smith and Wesson M&P-15, .223 caliber, with serial number SX31665. The rifle was loaded with thirty .223 bullets and one bullet in the chamber. Investigators identified the revolver as a RG Model 30, .32 caliber, with serial number 11244. The revolver was loaded with six bullets. The last number "4" of the serial number was hard to read, but appeared to be a "4."

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued authorizing the ATF, with appropriate assistance from other law enforcement officers, to arrest **Miguel A. Pizarro** and **Brian Pizarro** for the aforementioned violations of federal law.

Detective Jakob Blackman
ATF Task Force Officer

Sworn to, and attested by affiant via telephone after being submitted to me by reliable electronic means on November 10, 2020.

Honorable Teresa J. James
United States Magistrate Judge
District of Kansas

## PENALTIES

**Count 1:**     **18 U.S.C. §§ 1958**
**Conspiracy to travel in interstate commerce in the commission of murder-for-hire**

- \# NMT 10 years imprisonment,
- \# NMT $250,000 fine,
- \# NMT 3 years supervised release, and
- \# $100 special assessment.