1              UNITED STATES DISTRICT COURT
                   DISTRICT OF KANSAS
2

3   UNITED STATES OF AMERICA,

4        Plaintiff,

5        v.                          Case No. 20-CR-20080-JAR

6   MIGUEL A. PIZARRO  (01) and
    BRIAN PIZARRO (02),              Kansas City, Kansas
7                                    Date:  10 December, 2020
         Defendants.
8   .........................

9       TRANSCRIPT OF DETENTION HEARING, PRELIMINARY HEARING,
                     AND ARRAIGNMENT
10          BEFORE THE HONORABLE TERESA J. JAMES
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11

12                  A P P E A R A N C E S

13   For the Plaintiff:

14   Mr. Trent M. Krug
     OFFICE OF THE UNITED STATES
15   ATTORNEY
     500 State Avenue
16   Suite 360
     Kansas City, Kansas 66101
17
     For the Defendant Miguel Pizarro:
18
     Mr. Timothy H. Burdick
19   OFFICE OF THE FEDERAL PUBLIC DEFENDER
     500 State Avenue
20   Suite 201
     Kansas City, Kansas 66101
21
     For the Defendant Brian Pizarro:
22
     Mr. Mark Thomason
23   LAW OFFICE OF MARK THOMASON
     929 Walnut Street
24   Suite 101
     Kansas City, Missouri 64106
25

1                              I N D E X

2
     <u>Government's Witnesses</u>:                          <u>Page</u>
3
        Proffer by Detective Blackman                     6
4       Direct Examination by Mr. Krug                   14
        Cross-Examination by Mr. Burdick                 15
5       Cross-Examination by Mr. Thomason                20
        Further Proffer by Detective Blackman            24
6       Cross-Examination by Mr. Burdick                 28
        Cross-Examination by Mr. Thomason                29
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2           THE COURT:  Good afternoon.  The Court calls Case No.

3    20-20080, United States of America versus Miguel and Brian

4    Pizarro.  Could I have appearances of counsel, please?

5           MR. KRUG:  May it please the Court, the United States

6    appears by Trent Krug.

7           MR. BURDICK:  Tim Burdick on behalf of Miguel Pizarro.

8    Miguel Pizarro appears by video.

9           MR. THOMASON:  Good afternoon, Your Honor.  Mark

10   Thomason on behalf of Brian Pizarro who also appears by video,

11   and we filed a waiver as well.

12          THE COURT:  Thank you very much, counsel.  And good

13   afternoon to everyone.

14          Obviously we are proceeding by video conference again

15   today.  We are back today after appearing earlier this week for

16   the initial appearances of Miguel and Brian Pizarro for the

17   detention hearing today.

18          I think the defendants, Miguel and Brian Pizarro,

19   probably are familiar with everybody who's on the video

20   conference today.  In addition to the two lawyers, we have the

21   court reporter who is typing everything that is said today so

22   that we have a record.  And we have my courtroom deputy again,

23   Mr. Van Ness.  I believe we have your parents observing today.

24   And there's someone on the line for the probation office and

25   also the U.S. Marshal Service.

1          I will note for the record that both defendants'

2    counsel have filed waivers of personal appearance or consent to

3    proceed by video today, and we're obviously doing that because

4    of the COVID-19 pandemic and the risks associated with that.

5          Same rules or requests as when we were in court by

6    video conference previously.  I'll remind both of the

7    defendants if at any time you can't hear or understand, wave at

8    us so that we can correct any technical difficulties that might

9    occur.  And, also, if at any time you would like to speak

10   privately with your lawyer or lawyers in this case, also let me

11   know that and we can make that happen.

12         Then the only other thing I will note is that when we

13   were in court previously, we were here on the complaint that

14   the government has filed.  Since then an indictment has been

15   issued, so we are proceeding on the indictment, which once

16   again has the same operative count against the defendants of

17   murder for hire charge.

18         With that, I think we're ready to proceed with the

19   detention issue.  Mr. Krug, are you ready to proceed for the

20   government?

21         MR. KRUG:  Yes, Your Honor.

22         THE COURT:  All right.  Go right ahead.

23         MR. KRUG:  Thank you, Judge.  And I first ask the

24   Court to take judicial notice of the information that's

25   contained in the pretrial services reports.  I will have

1    specific argument as it relates at the appropriate time.

2            And, Judge, second, I have Jake Blackman who is with

3    the Kansas City, Kansas, police department as well as the task

4    force officer with the ATF.  He is in my office to testify this

5    afternoon.

6            And I just wanted to throw this out there for counsel

7    and the Court.  We're trying to maintain the appropriate

8    distance as he's in my office.  So, Judge, I would ask rather

9    than the government making a proffer of the facts, that Jake

10   Blackman is allowed to provide a narrative, if you will, a

11   summary of the investigation, and then we can get into some

12   specific 3142 factors as it relates to the government's request

13   for detention on both defendants.

14           So if that's appropriate and there's no objection, I

15   would ask that Jake Blackman be sworn in and, again, provide a

16   summary of this particular investigation.

17           THE COURT:  Mr. Burdick, on behalf of Miguel Pizarro,

18   do you have objection to proceeding with Officer Blackman

19   giving a narrative initially rather than through direct

20   examination?

21           MR. BURDICK:  No objection, Judge.

22           THE COURT:  Mr. Thomason, do you have any objection to

23   that procedure?

24           MR. THOMASON:  No, Your Honor.

25           THE COURT:  All right.  Then, Mr. Krug, I will allow

20-CR-20080-JAR    USA v. Pizarro    12.10.20                    6

1    that.  I think that it's -- will make things go more smoothly

2    under our current environment.

3            I am not seeing Mr. Blackman.  Should I be seeing him

4    on the screen?

5            MR. KRUG:  Not yet, Judge.  I am going to turn the

6    screen over to him, so my computer is unmuted right now, so if

7    there is any difficulties hearing Officer Blackman, please let

8    us know.

9            THE COURT:  Thank you.  And, Officer Blackman, if you

10   will raise your right hand when you get situated there, Mr. Van

11   Ness will give you an oath.

12                     DETECTIVE JAKOB BLACKMAN,

13   called as a witness on behalf of the government, having first

14   been duly sworn, testified as follows:

15           THE COURT:  Go right ahead whenever you're ready,

16   Mr. Krug -- or I guess, Officer Blackman.

17           THE WITNESS:  Hello, ma'am.

18           This investigation started roughly around the summer

19   of 2020 where an ATF undercover had been in contact with an

20   individual by the name of Miguel Pizarro.  There were two --

21   the initial two firearm purchases took place in June of 2020

22   and then again in August of 2020.

23           On October the 9th of 2020 the ATF undercover had

24   received a telephone call from Miguel Pizarro on the number

25   that they had been communicating on, and Mr. Pizarro had

1    said -- Miguel Pizarro had said that he had some toys for sale,

2    which was a term known to law enforcement and myself as

3    firearms.

4              The ATF undercover further inquired about what kind of

5    firearm was for sale, and Miguel Pizarro had said it was a

6    firearm that he had been trying to purchase from him prior,

7    which was believed to be a .45-caliber pistol, some kind of a

8    Springfield-type model.  Miguel Pizarro also further indicated

9    there was a G-man, which is a known street name for a Glock

10   pistol, as well for sale.

11             On that specific date, which was 10 the 6th, is when

12   that phone call was made.  The deal was set to take place on 10

13   the 9th, which was October 9th, three days later.

14             At that point the undercover made contact with Miguel

15   Pizarro at an area in Kansas City, Kansas, spoke with him from

16   outside of a vehicle while Miguel Pizarro was in the driver

17   seat of his vehicle.  At one point Miguel Pizarro provided what

18   appeared to be two firearms to the undercover agent.

19             The undercover agent asked Miguel Pizarro if -- how

20   dirty the firearms were, which is another term known to police

21   as being a firearm used in some kind of a crime.  At that point

22   Miguel Pizarro said some kind of term like 6 feet under,

23   indicating the person was dead.

24             At that point the undercover further asked Miguel

25   Pizarro about the incident and asked if he had done it.  He

1    said he had, and he asked if he had heard about the murder that

2    took place in the 4400 block by KU.  That was believed to be by

3    the University of Kansas Medical Center, which was an area of

4    4400 block of Adams Street.

5          Miguel Pizarro then further described the incident

6    that took place -- alleged incident that took place, described

7    there were cars next to each other, saw the person's eyes, shot

8    the person in the shoulder, and then kept shooting through the

9    door.

10          At one point the undercover was able to remove both

11    firearms from Miguel Pizarro, took them back to the undercover

12    vehicle, and then returned back and provided U.S. currency for

13    those firearms.

14          Conversation continued and Miguel Pizarro said the

15    individual that was killed was responsible for shooting his

16    brother back in May previous, May of 2020, where his brother,

17    who I believed to be Brian Pizarro, was shot.

18          Further indication indicated by Miguel Pizarro that he

19    had traveled to Colorado.  When the undercover asked why, he

20    said to get away from the incident that had taken place up on

21    Adams, believed to be the murder.

22          At one point the deal was over.  The undercover left.

23    And then on October 28th of 2020, there was another meeting,

24    and a couple days prior the undercover had called Miguel

25    Pizarro and asked him who he trusted more than anyone.  At that

1    point he said his brother, and there was a meeting that took

2    place in the area of South 51st Street and Gibbs Road in Kansas

3    City, Kansas.

4            At that point the undercover pulled up into the area

5    in a vehicle.  Miguel Pizarro and another person were observed

6    walking towards the undercover vehicle on foot.  Miguel Pizarro

7    sat in the front passenger seat.  Brian Pizarro was identified

8    and sat in the back of the undercover vehicle.

9            At that point the undercover agent told a fictitious

10   story about an individual in Springfield, Missouri, who he

11   wanted to have executed, and it was a job if the two were

12   interested.  Both agreed and were interested in doing the job,

13   and the undercover had asked Miguel Pizarro -- or he had said

14   that I know what you have done because you have told me, but

15   didn't know about the person who was in the backseat.

16           At that point the person in the backseat identified as

17   Brian Pizarro said -- had asked his brother Miguel if he told

18   him about Luis, and Luis was an individual identified as a

19   victim from a murder that took place in the 4400 block of Adams

20   Street back in September of 2020.

21           Miguel Pizarro said he did tell him, and then Brian

22   Pizarro began walking through a story of another murder that

23   took place down in Armourdale area of Kansas City, Kansas,

24   where he said he had shot one person who was paralyzed, and

25   then shot another person as that person was approaching an

1    alley.  He was shot in the back, and then they found him

2    deceased days later.

3            During the interaction, Brian Pizarro had a cellular

4    phone, pulled up the news article, and handed the phone to the

5    undercover agent, who then was able to actually read off the

6    phone during the encounter.

7            There was further indication about what was to take

8    place in Springfield, Missouri.  There was an individual who

9    lived in a house down there.  The undercover was going to get

10   more information, but that he needed him executed and wanted

11   the execution/murder to look like a robbery and told both Brian

12   and Miguel Pizarro that he needed his wallet.

13           There was a brief discussion about payment, and Brian

14   and Miguel said that the -- $10,000 if two of them did it and

15   15 if another person was involved.  The undercover told both

16   Brian and Miguel Pizarro that the job was worth about 10 to

17   $12,000, and both agreed on the money.

18           At one point the undercover dropped both of them off

19   on a street down the road from their meeting spot and left the

20   area.

21           There was a second meeting that took place on

22   November 4th of 2020.  Again, the undercover had contacted

23   Miguel Pizarro, and Miguel Pizarro had sent the address of 3400

24   Orville Avenue in Kansas City, Kansas, on a place to meet.

25   That address belonged to Frances Willard Elementary School,

1    which was not in session and it was an empty lot.

2            At that point the undercover arrived on scene, and,

3    again, Miguel Pizarro and Brian Pizarro were observed walking

4    up the street and entering the undercover vehicle.

5            The undercover agent asked if they were cool, and then

6    Brian Pizarro said that they needed money in order to make some

7    action.  The ATF undercover said the guy needed to be dead and

8    both Brian and Miguel Pizarro agreed.

9            The date the undercover said was going to be the

10   following Tuesday, which was November the 10th of 2020 in

11   Springfield, Missouri.  Brian said they were going to get a

12   Dodge Durango that was stolen and were going to use that

13   vehicle to drive down there, said that he was going to use a

14   Smith & Wesson AR-15 to commit the murder, and Miguel said he

15   was going to use a pistol and pulled out what appeared to be

16   some sort of Smith & Wesson-type revolver.

17           Prior to the meeting coming to an end, the ATF

18   undercover provided $800 of U.S. currency which was to be used

19   for travel expenses for the two to drive to Springfield,

20   Missouri, the following Tuesday.

21           The last meeting before the arrest of both Miguel and

22   Brian Pizarro was on November 9, 2020.  The ATF undercover was

23   contacted by Miguel Pizarro and asked if they could meet one

24   more time, said that they needed 200 more dollars for shells,

25   which was believed to be for ammunition, and the meeting took

1    place again back at that empty parking lot at 3400 Orville.

2           At one point the ATF undercover arrived, parked the

3    vehicle, and Miguel and Brian Pizarro arrived on foot.  While

4    they were speaking, Brian Pizarro showed the ATF undercover a

5    revolver and Miguel Pizarro said he would be using a .40.

6           During the conversation the ATF had told both Brian

7    and Miguel Pizarro two separate times if they didn't want to do

8    the job, to let him know, but both Miguel and Brian agreed to

9    do the job.  $200 more were paid for the shells to be

10   purchased, and then at one point the undercover left the area.

11          On November 10, 2020, the ATF personnel set up in

12   Springfield, Missouri.  There was conversation and address sent

13   by the ATF undercover to Miguel Pizarro's phone, which was an

14   address in Springfield, Missouri.  The two were supposed to

15   meet with another person who was supposed to be an associate of

16   the undercover, and that person who would later be another

17   undercover agent with the ATF was to show them the house where

18   the person was supposed to reside who they were supposed to

19   kill.

20          At around 12:15 p.m., the new undercover, the second

21   undercover, parked his vehicle at an address in Springfield,

22   Missouri.  A silver Mitsubishi vehicle was driven to that spot,

23   pulled into an empty lot next to the ATF No. 2's vehicle.

24   Brian Pizarro exited the rear driver's seat of that Mitsubishi,

25   walked up to the ATF undercover, and the ATF undercover said

1    something to the effect, are you Bill's dudes, referring back

2    to the first undercover.

3             Brian responded, yeah, and they are doing the hit with

4    me.  In the vehicle appeared to be another person in the front

5    passenger's seat, and Miguel Pizarro was in the driver's seat.

6             The ATF undercover sat in the Mitsubishi behind the

7    front passenger, and Brian sat back in behind the driver, so at

8    that point there were four individuals inside the silver

9    Mitsubishi.

10            The ATF undercover observed what appeared to be a

11   revolver on the front passenger's lap, who would later be

12   identified as Alfredo Aguilera.

13            The plan was going to be to have all three individuals

14   enter the other ATF undercover vehicle, and the ATF undercover

15   was supposed to take them to the house to show them the address

16   and then bring them back to the Mitsubishi.

17            At one point during the encounter Brian Pizarro said

18   the chop was in the trunk.  A chop is also a known term to be a

19   rifle-type firearm.

20            At one point the undercover exited the Mitsubishi.

21   Brian Pizarro exited the Mitsubishi, walked over to an area

22   by -- it was like a warehouse area.  And at that point Miguel

23   Pizarro said something to the effect that he wanted to turn the

24   vehicle around because it was kind of nosed in in the parking

25   stall.

1      As that was happening, special -- special response

2  team with the ATF made contact and was able to effect the

3  arrest of Brian Pizarro, Miguel Pizarro, and Alfredo Aguilera.

4      MR. KRUG:  Sorry, Judge.  I have just a couple

5  questions for the officer.

6                    DIRECT EXAMINATION

7  BY MR. KRUG:

8  Q.  After the arrest was effectuated on November 10th, were

9  there any firearms that were located in the vehicle?

10  A.  Yes, sir.

11  Q.  Can you tell the Court what those were?

12  A.  There was a revolver that appeared to be on the front

13  passenger's area and believed to have had fallen to the ground

14  during the arrest, which would have been on Alfredo Aguilera's

15  person, which was the front passenger's seat.  That revolver

16  was identified as an RG model .32-caliber pistol with six

17  bullets.  Serial number was 11244.  That firearm was similar to

18  what was observed earlier by the undercover on Miguel and Brian

19  Pizarro.

20      The rifle was found in the trunk, and that was a Smith &

21  Wesson AR-15, .223-caliber rifle, with 30 rounds of ammunition

22  in the firearm.

23  Q.  Sir, do you recognize Miguel and Brian Pizarro on this Zoom

24  call?

25  A.  I got to click -- there's a blue box that I got to -- exit

1    out here.

2       Miguel Pizarro is in the box directly next to me, if that's

3    how everybody, I guess, can see it.  He would be to my left of

4    Mr. Burdick -- I guess to Mr. Burdick's right on the screen.

5    And then Brian Pizarro is wearing the orange attire and has his

6    hair slicked back.

7          MR. KRUG:  Judge, that would end the summary portion

8    of the evidentiary with respect to the indictment that was

9    returned yesterday.

10         I would open at this time cross-examination of

11   Detective Blackman for defense counsel if they have any with

12   respect to the facts of the case.

13         THE COURT:  Thank you.

14         Mr. Burdick, cross-examination.

15         MR. BURDICK:  Thank you, Judge.

16                     CROSS-EXAMINATION

17   BY MR. BURDICK:

18   Q.  Agent Blackman, you testified that an undercover agent

19   purchased two firearms from Miguel Pizarro, correct?

20   A.  That's correct.  The first incident was through Miguel

21   Pizarro.  The firearm, I believe, belonged to a person that he

22   brought with him.

23   Q.  And that undercover agent was somebody other than you?

24   A.  That's correct.

25   Q.  Were you present when this sale was to have occurred?

1    A.    I was present on every encounter except it would have been

2    the second encounter, which was the August 21st encounter.    I

3    was on every other one, in the area in some shape or form.

4    Q.    The sale of these firearms, if they were to have occurred

5    from Miguel Pizarro to an undercover agent, is that a violation

6    of the law?

7    A.    Not on Miguel Pizarro with his criminal history by himself.

8    He is not a federally prohibited felon to my knowledge.

9    Q.    So what was the point of setting up that transaction if the

10   behavior wasn't a violation of the law?

11   A.    So Mr. Pizarro -- when it was learned in early -- sort of

12   the summer of 2020 that Miguel Pizarro could possibly be

13   selling firearms, he was well known to the Kansas City gang

14   unit as well as myself.    He was an individual believed to be

15   involved in gang violence, which had kind of slomped our city

16   throughout the summer of 2020.

17        So it was a way and a tool to try to purchase firearms that

18   could have been crime guns that further deal with criminal

19   involvement in Wyandotte County in Kansas City, Kansas, as well

20   as the District of Kansas.

21   Q.    So I'm going to see if I understand this correctly then.

22   The idea is that the ATF purchases the firearm, and then they

23   can try to maybe run some testing and see if ballistic testing

24   would tie it to any homicides or shootings in the area; is that

25   right?

1    A.    I think that's a correct statement, sir.

2    Q.    Okay.  But those sales in and of themselves would not have

3    been a reason or given you the ability to charge Mr. Pizarro,

4    Miguel Pizarro?

5    A.    That's correct.

6    Q.    Okay.  Now, you described that during, I think, one of

7    these transactions there was a conversation about a shooting,

8    and your testimony was that Miguel Pizarro essentially said

9    that he was responsible for the shooting of someone else in

10   the, like, 4400 block of some area; is that right?

11   A.    That is correct, sir.

12   Q.    And as a result of that information, at least at this point

13   are you aware of any state charges against Mr. Pizarro based on

14   that?

15   A.    No, sir.

16   Q.    Is it your understanding that there will be state charges

17   as a result of that?

18   A.    It's still under investigation, and it could possibly be

19   pending.

20   Q.    Okay.  So as you've described this from the beginning, this

21   scenario is a fictitious story, right?

22   A.    That's correct.

23   Q.    So the ATF or the agents that you're working with made up

24   this whole situation?

25   A.    Correct.

1    Q.   And so at no point was there anybody that was going to be

2    on the other end of a shooting based on what you set up with

3    the Pizarros; is that right?

4    A.   That is right.

5    Q.   And so the purpose of this then was to put Miguel and Brian

6    Pizarro in a position to where they would violate federal law?

7    A.   Correct.

8    Q.   So that you could then charge them, right?

9    A.   Correct.

10   Q.   Okay.  And in the process of this, at some point the agents

11   or you actually provide the Pizarros with money, right?

12   A.   Correct.  Yes, sir.

13   Q.   With the idea that this is going to be some sort of front

14   for what they've been asked to do?

15   A.   Correct.  The first payment was for travel expenses to

16   get --

17            THE REPORTER:  Pardon me.  I believe we've lost one of

18   the defendants.

19            MR. BURDICK:  Yes.  Mr. Miguel Pizarro.

20            COURTROOM DEPUTY:  Let me try calling CCA.  Just a

21   moment.

22            THE COURT:  I thought I heard someone say something.

23   Miguel, are you hearing this?

24            MR. B. PIZARRO:  He's not here right now.  It kicked

25   him out.  And they're trying to get him back on right now.

1   He's next door.  I was talking to him.

2        COURTROOM DEPUTY:  They're working on getting him

3   reconnected right now.

4        He should be coming back now.

5        THE COURT:  All right.  I think we're ready to

6   continue.

7        MR. BURDICK:  Thank you, Judge.

8   BY MR. BURDICK:

9   Q.   So, Agent Blackman, but for the fictitious story that the

10  agents created and the proposition that they put to Miguel

11  Pizarro and Brian Pizarro, the behavior that they're charged

12  with now wouldn't have occurred?

13  A.   Can you say that again, sir?  Say that one more time,

14  please.

15  Q.   I don't know if I can.

16       But for the fictitious story that the agents created and

17  the proposition that they put to the Pizarros, the behavior

18  that they've been charged with here would not have occurred?

19  A.   That's correct.

20  Q.   And but for the fact that the fictitious story included

21  travel to Springfield, Missouri, there wouldn't be federal

22  jurisdiction for this charge?

23  A.   That's correct.

24  Q.   Okay.

25       MR. BURDICK:  I don't have any other questions about

1    the offense.  Thank you.

2           THE COURT:  Thank you, Mr. Burdick.

3           Mr. Thomason.

4                        CROSS-EXAMINATION

5    BY MR. THOMASON:

6    Q.  I'll try not to ask some repetitive questions.  Agent

7    Blackman, as it relates to Brian Pizarro, if I understand

8    correctly, he wasn't involved with any of the initial meetings

9    in regards to the firearms; is that correct?

10   A.  That's correct.

11   Q.  And, in fact, if I understood your testimony, he was never

12   present until the undercover agent asked, who do you trust more

13   than anything?

14   A.  That's correct too.

15   Q.  He didn't tell him why he trusted him or -- was he telling

16   him he wanted him to commit a murder when he asked who he

17   trusted?

18   A.  I don't believe so, sir.  I don't believe that it was in

19   that context.  The dialogue was, I believe, who do you trust

20   more than anyone?  And he said, my brother.

21   Q.  And then I guess I don't understand what the purpose of the

22   meeting was.

23   A.  I think there was -- there may have been -- and I'm trying

24   to remember all the facts of the case I've reviewed.  The

25   undercover may have said, I have a job, but there was no

1    details that were said initially to Miguel Pizarro, but wanted

2    to meet to discuss the job.  And at that point he asked him --

3    he posed a question, who do you trust more than anyone?  And

4    Miguel Pizarro said, my brother.

5    Q.    The -- I think you indicated previously that the reason for

6    purchasing the firearms is so that they could run the

7    ballistics to see if those had been used in any other crimes;

8    is that somewhat accurate?

9    A.    Yes, sir.

10   Q.    And you indicated I think the first firearm purchased

11   happened in June of 2020; is that correct?

12   A.    That is correct.

13   Q.    What did those ballistic reports show?

14   A.    You know, I don't have the NIBIN analysis right now with

15   me.  I can't remember honestly off the top of my head if those

16   matched anything or if they did or did not.  I'm not sure.

17   Q.    Do you know when they were done?

18   A.    I didn't take them to NIBIN, but it was shortly after,

19   within days to a week or two at the most after the firearms

20   were purchased.

21   Q.    So if those would have matched something, would that have

22   given you a basis to charge them with a crime?

23   A.    I think that would depend on the circumstances.  You know,

24   NIBIN is a preliminary test.  Everything would have to be done

25   by labs to verify NIBIN and then get into the facts of the case

1   and go from there.  It would be the very beginning stages.

2   Q.   I'm assuming in this case, because I think you've referred

3   to him as an undercover and an agent, that the individuals

4   working in an undercover role were law enforcement officers?

5   A.   That's correct.

6   Q.   They weren't public people that work as an -- some sort of

7   a CI?

8   A.   No.  The purchases that were made by the undercover was by

9   the undercover who was an agent.  There was an informant that

10  was introduced -- well, let me back that up -- that introduced

11  the undercover.

12       The following -- the first two deals were done in the

13  presence of an informant, a confidential informant.  After

14  that, from the time that the undercover met Mr. Pizarro when he

15  purchased the two firearms and the first discussion of the

16  alleged murder took place, that was just with the undercover

17  and Mr. Pizarro, and from that point following was just the

18  undercover, Miguel Pizarro, and later Brian Pizarro.

19  Q.   So based on what you're saying there, I'm assuming as it

20  relates to Brian Pizarro, the undercover agent is the

21  individual that he would have had some contact with?

22  A.   Yes, sir.

23  Q.   Were these meetings recorded?

24  A.   Yes, sir, video and audio.

25  Q.   All of them?

20-CR-20080-JAR    USA v. Pizarro   12.10.20                    23

1  A.  Yes, sir.

2  Q.  They all work?

3  A.  Yes, sir.

4  Q.  You reviewed them all?

5  A.  I have.

6  Q.  Did you know anything about their status or immigration

7  status at the time that you began the investigation?

8  A.  I didn't specifically know in the very beginning of their

9  immigration status.  I believed -- I remember believing -- or

10  hearing one of them may have been a Dreamer, I believe, but I

11  can't even remember which one that was at the time.

12  Q.  And I think you said that at the time that they were

13  arrested in Springfield, there was actually a third individual

14  involved?

15  A.  That's correct.

16  Q.  Do you know what his status is?

17  A.  I believe he's -- as far as immigration, sir?

18  Q.  No.  As far as the charges.

19  A.  It's pending.  He has not been arrested -- well, he has not

20  been charged with this incident.

21         MR. THOMASON:  No further questions, Your Honor.

22         THE COURT:  All right.  Thank you.

23         Mr. Krug, any redirect?

24         MR. KRUG:  No, Your Honor.

25         THE COURT:  All right.  Then thank you, Officer, for

1    your testimony, and I would normally say you may step down, but

2    you're free to leave if you would wish, unless Mr. Krug asks

3    otherwise.

4         MR. KRUG:  Judge, I do have some additional

5    information with Detective Blackman still under oath,

6    recognizing that this hearing is designed for the Court to

7    consider whether or not there are conditions or a combination

8    of conditions that would allow for the release of both

9    defendants, Judge, there's some other information I'd like the

10   Court and counsel to consider with respect to Detective

11   Blackman's involvement with other investigations involving

12   these two individuals.

13        So I would ask him again under the same kind of

14   circumstances just to summarize some of the incidents and the

15   dates that would relate to the government's concern with

16   respect to flight risk and dangerousness to the community.

17        And, Detective, you're still under oath with respect

18   to that; is that correct?

19        THE WITNESS:  Yes, sir.

20        THE COURT:  Officer Blackman, then you may proceed.

21   And I do remind you that you are still under oath.

22        THE WITNESS:  Yes, ma'am.

23        So when I was notified the investigation about Miguel

24   Pizarro, I believe, like I said, I was familiar with Miguel and

25   Brian Pizarro.  From 2016 through 2018 I served in the gang

1    unit in the Kansas City Police Department as a detective

2    working various criminal street gang crimes and had some

3    knowledge of both Brian and Miguel Pizarro.

4           And dating back from July 15, 2017, there was a

5    drive-by shooting that took place down at 36 South 25th Street

6    in Kansas City, Kansas.  There were -- two of the seven

7    juveniles, I believe, were struck or at least grazed.  Miguel

8    Pizarro was struck in the leg from that incident.  And later

9    Detective Diaz, who was at the time a gang detective, would

10   interview Miguel Pizarro who indicated that the person who shot

11   him belonged to the gang SPV, which is another Sureño-based

12   gang in Kansas City, Kansas.

13          The next incident was November 30, 2017.  KCKPD

14   officers responded on a call from, I believe it was Miguel

15   Pizarro's father, Miguel Pizarro and looking for his runaway

16   son.  Officers were able to go to a different residence and

17   located Miguel Pizarro, and there was a .40-caliber pistol on a

18   couch next to Miguel Pizarro.  That firearm was reported stolen

19   out of Oklahoma.

20          And he was also interviewed by Detective Diaz where

21   Miguel Pizarro during the interview had admitted to being a

22   gang member with the Locotes F-13 and was believed to be

23   allowed in the gang, or what we would call blessed in, not beat

24   in for any specific time, but just allowed in the gang.

25          On December 11, 2017, there was an aggravated robbery

1    that took place in Kansas City, Kansas.  It involved three

2    individuals that took a car at gunpoint while being armed.

3    Shortly after there was a vehicle pursuit from KCK into Kansas

4    City, Missouri, where officers arrested Brian Pizarro, Enrique

5    Talmantes, and Alfredo Aguilera, and I think subsequently

6    charged in juvenile court for robbery, and I believe there was

7    another person involved but -- not in the robbery but in the

8    vehicle.

9         May 9, 2020, there was an aggravated battery shooting

10   where Miguel Pizarro was, again, shot down at the residence of

11   1209 Argentine Boulevard.  It's a house that belongs to -- I'm

12   not sure which parent or which relative, but known that the

13   Pizarros have resided in.  Briefly going through the records,

14   it appeared he was walking out the back door and someone shot

15   Miguel Pizarro.  He would recover from his injuries to his

16   right foot or right ankle area.

17        Shortly after, a couple weeks later, May 24, 2020,

18   there was another shooting incident at the 1209 Argentine

19   Boulevard in Kansas City, Kansas, this time involving Brian

20   Pizarro, Anthony Linares, and Rey Villalobos.

21        Indicators is those three were in a vehicle.  Somebody

22   shot into the vehicle, I believe, striking every one of them.

23   The vehicle went up to KU Medical Center shortly up the road --

24   or shortly down the road, and unfortunately Villalobos was

25   succumbed to his injuries and was killed that night.

1          And then just the only thing that I have noted on here

2     as well is the homicides that were described by Brian Pizarro

3     and Miguel Pizarro during the undercover meets, at least the

4     incidents, not necessarily the suspects or those two being the

5     ones that perpetrated the crimes or at least the incidents did

6     occur on August the 25th.

7          There was two individuals that were shot down off 11th

8     and Miami, Nestor Gutierrez and Cristian Ramos.  Mr. Gutierrez

9     -- believed an argument had taken place.  Nestor Gutierrez

10    sustained an injury where he is paralyzed, and Cristian Ramos

11    was found and deceased in an alley hours later in the early

12    morning hours suffering from a gunshot wound to the back.

13         And then finally on September 26th the 4400 Adams

14    murder, there was a individual by the name of Luis

15    Velasquez-Chavez, who's a 15-year-old kid that was killed,

16    believed to be exiting his vehicle, transported to KU Medical

17    Center, expired from his injuries.

18         There were multiple .45-caliber casings on the scene of

19    that and bullet holes in the driver door, and that would be the

20    case that was explained by Miguel Pizarro.

21         And, finally, backing up just slightly, on August 11,

22    2020, 329 North 35th Street, that is the known address of, I

23    believe, Miguel Pizarro --  I'll call him senior, the father of

24    Miguel and Brian.  There was a drive-by shooting at that

25    residence where a vehicle in the house was struck by gunfire.

1          THE COURT:  Mr. Krug, anything further before

2   cross-examination from Mr. Blackman?

3          MR. KRUG:  No, Your Honor.  Thank you.

4          THE COURT:  Mr. Burdick, any further questions for

5   Officer Blackman?

6          MR. BURDICK:  A couple, Judge.  Thanks.

7                       CROSS-EXAMINATION

8   BY MR. BURDICK:

9   Q.   Agent Blackman, I just want to make sure that I have this

10  correct.  The incident of July 15, 2017, is an incident in

11  which Miguel Pizarro was the victim of a crime, correct?

12  A.   That is correct.

13  Q.   And the incident on May 9th of 2020, again, is an incident

14  in which Miguel Pizarro was a victim of a crime, correct?

15  A.   That is correct.

16  Q.   With regard to this shooting that occurred May 24th of

17  2020, it is reported that Miguel Pizarro indicated that he

18  heard gunfire but was not part of that incident, correct?

19  A.   That's my understanding, correct.

20  Q.   Okay.  And, again, as I think the date that you gave was

21  August 11th of 2020, that there was a drive-by shooting at a

22  particular residence, is that the right date, August 11th?

23  A.   October 11th, sir.

24  Q.   October 11th.

25       Again, the scenario in which you've described, anybody that

20-CR-20080-JAR    USA v. Pizarro  12.10.20                    29

1    would have been in that residence would have been a victim of a

2    drive-by shooting, correct?

3    A.   Correct.

4         MR. BURDICK:  Okay.  I don't have any other questions.

5    Thank you.

6         THE COURT:  Thank you.

7         And Mr. Thomason.

8                     CROSS-EXAMINATION

9    BY MR. THOMASON:

10   Q.   Officer, I'd just go through, I guess, the same scenario.

11   The July 15th incident, I believe you said Brian was present

12   but would have also been a victim of the shooting, although he

13   wasn't shot?

14   A.   Yes.  That's my understanding, aggravated assault victim

15   or -- correct.

16   Q.   The November 30th incident, he wasn't involved, correct?

17   A.   That's correct.

18   Q.   The December 11th incident, what was his involvement there?

19   A.   That was an armed carjacking that took place in Kansas

20   City, Kansas.

21   Q.   And remind me who you say was present for that event.

22   A.   Enrique Talamantes, Alfredo Aguilera, and Brian Pizarro.

23   Q.   Okay.  And then the May 9th event.

24   A.   No, sir.  No, sir.  That was Miguel's brother.

25   Q.   And to your knowledge, none of these events with, I guess,

1    the exception of the December 11th event have resulted in any

2    charges?

3    A.    As far as the ones we've just discussed, no.

4    Q.    What about any other ones we didn't discuss?  Have any of

5    those resulted in charges against either of these?

6    A.    Charges but not against those two, sir.

7              MR. THOMASON:  Okay.  No other questions, Your Honor.

8              THE COURT:  Thank you.

9              Mr. Krug, any redirect for Officer Blackman?

10             MR. KRUG:  No, Your Honor.

11             Judge, we would rest at this time, but would have

12   specific argument as it relates to detention at the appropriate

13   time.

14             THE COURT:  Thank you.

15             Mr. Burdick, do you care to present any evidence or

16   testimony on behalf of Miguel Pizarro?

17             MR. BURDICK:  Judge, I have no witnesses to present,

18   but I do have some information to proffer with regard to

19   Miguel's release plan.  It is laid out in a sense in the bond

20   report, but I just wanted to inform the Court that I was able

21   to speak directly with Miguel's father and confirmed that he

22   would be able to reside at his father's residence at 329 North

23   35th Street in Kansas City, Kansas, while this case is pending.

24             I was also able to confirm through his father that

25   Miguel would have the opportunity to work with his father doing

1    construction or home repair as basically an aid to his father

2    in that work, so he would have work available for him as well.

3              THE COURT:  Thank you.  Any other evidence you'd like

4    to proffer?

5              MR. BURDICK:  No, Judge.

6              THE COURT:  Mr. Thomason, any evidence you would like

7    to present or proffer?

8              MR. THOMASON:  Your Honor, a couple of things, a

9    couple of minor corrections to the pretrial services report

10   that was done down in the Western District of Missouri.  I'm

11   not sure any of these are major changes, but I'll go ahead and

12   point them out.

13             THE COURT:  I noticed several of those too,

14   Mr. Thomason.  Yeah, why don't you go ahead and note them.

15   Several things stuck out to me too and we might as well try and

16   clarify.

17             MR. THOMASON:  In the defendant history section, Your

18   Honor, Brian Pizarro is actually 19 years old instead of 20.

19   The -- he actually came to the United States at the age of

20   three.

21             It indicates as well that -- I think this is in the

22   employment history section -- that he graduated from high

23   school in 2020.  He is actually two credits short, so he has

24   not graduated from high school.

25             And then in the mental health section, Your Honor, it

1   doesn't specifically state it, but he was diagnosed with PTSD

2   and is currently awaiting to speak with a mental health doctor

3   there at CoreCivic.

4           Those are the changes in the -- I don't know if there

5   was something specific the Court saw besides those, but those

6   were the changes I would say in the presentence report that are

7   different.

8           The other, Your Honor, I actually spoke with Brian and

9   Miguel's mother yesterday.  I think as indicated in the bond

10  report or at least in maybe an e-mail to the Court about the

11  updated status on release plan, that really either of the homes

12  was an option for them, that if the Court found it was

13  necessary that they not be at the same location, I think that

14  the mother's home would be available as well.

15          Mr. Pizarro would continue to work.  I understand

16  there's some issue, Your Honor, about immigration status, but I

17  would indicate to the Court that I don't think that in and of

18  itself is a basis for detention.

19          Other than those things, Your Honor, I don't have any

20  other evidence.  It's just argument.

21          THE COURT:  Thank you.  Then there being nothing

22  further, I think we're ready to move on to argument.  And so,

23  Mr. Krug, if you would like to present any argument on the

24  detention issue, go ahead.

25          MR. KRUG:  Thank you, Judge.  And I'll start with

1    Miguel Pizarro.  The government does believe by a preponderance

2    of the evidence that no condition or combination of conditions

3    will reasonably assure the appearance of Miguel.  The defendant

4    does pose a flight risk, Judge, just based at least on his

5    criminal history, recognizing he's 20 years old in the sense

6    that Mr. Miguel Pizarro appears highly unlikely to comply with

7    fairly standard release conditions, and that's based upon the

8    juvenile cases in Wyandotte County, his performance, and some

9    of the entries that are contained in the pretrial services

10   report.

11          Judge, I would also echo the facts that were

12   summarized by Detective Blackman, the defendant's affiliation

13   to not only gang-related activities but violent activities here

14   in Kansas City, Kansas; the fact that there were two firearms

15   recovered on November 10th, the date of the arrest.  Both of

16   those firearms were loaded.  Miguel has been wounded

17   previously, recognizing that he could have been a victim of a

18   non-gang-related issue, and that still shows an association

19   with violence.

20          We would, again, adopt the recommendations that are

21   set forth in the bond report that essentially reflect with

22   respect to risk of flight, the offense charged, the defendant's

23   conduct during the investigation, substance abuse history, lack

24   of verifiable legitimate employment, and the assessment of

25   danger when it comes to the incident offense, his gang

1   involvement ties, and firearms possession.

2          So with respect to Miguel, Judge, we believe there's

3   no basis for release in this case.

4          Similarly, with Brian Pizarro, Brian is 19 years old

5   as clarified by Mr. Thomason.  With respect to his prior

6   history, he was adjudicated of aggravated robbery back in 2018

7   in March, and he as well did not have a clean record as it

8   comes to performance while on release.

9          There were violations of his conditional release.  A

10  firearm, as Detective Blackman had testified to, was involved

11  in that particular offense in December 11th of 2017, where

12  Brian along with two other individuals had pulled firearms on a

13  person and taken their vehicle at a car wash.

14         So, Judge, for the same reasons as I had outlined with

15  respect to Miguel, there are no conditions that would satisfy

16  the defendant's appearance in further court proceedings, and we

17  also do believe based on the nature of the offense, his

18  association with gang activities and firearms, that he does by

19  a clear and convincing evidence standard present an issue with

20  respect to community safety.

21         So with all of that being said, Judge, we are asking

22  for detention of both defendants.

23         THE COURT:  Could you, Mr. Krug, address the question

24  of whether these firearms that were obtained from the

25  defendants are connected to any other criminal activity.

1        MR. KRUG:  I will, Judge.  And this is all based upon

2    preliminary testing, if you will, ballistic testing.  We do not

3    have the final reports from that.  And I have Detective

4    Blackman here to correct me if I'm wrong.

5        But, Judge, this again goes back to one of the

6    first -- this was the third purchase from Miguel Pizarro in

7    which there was a 924 -- let me see.  Hang on -- a .45-caliber

8    pistol and a 9-millimeter pistol that were obtained by the ATF

9    undercover.  The initial ballistics test revealed that there

10   were 45 shells that were connected to one of those firearms,

11   the .45-caliber pistol involved with this September 2020

12   homicide.  Again, Judge, that has not been -- we don't have a

13   final report, but that's the initial ballistic testing.

14       THE COURT:  And that's the -- which incident is it

15   tied to?

16       MR. KRUG:  Judge, that would have been -- let me get

17   my facts here.  That would have been gun buy or gun purchase

18   No. 3 on or about October 9th of 2020.  Here the ATF undercover

19   is interacting with Miguel only.  Miguel indicates that the

20   firearms that he had, a .45 and a 9 millimeter he wanted to get

21   rid of, so those two were sold to the undercover.  Subsequently

22   those were sent in for ballistic testing and the .45 caliber

23   came back to this September homicide, again initially.

24       THE COURT:  Thank you.  Any others?  Are any of the

25   weapons tied to incidents involving Brian Pizarro?

1        MR. KRUG:  Judge, I do not believe we have final

2   reports on any of those NIBIN testing that were recovered from

3   Brian.  And I think just Brian had the revolver during the

4   interaction with the ATF you see, and then ultimately on

5   November 10, 2020, they found a rifle, and that examination is

6   ongoing.

7        THE COURT:  All right.  Thank you.

8        Mr. Burdick.

9        MR. BURDICK:  Judge, I think I will start with the

10  discussion about the charges that Miguel Pizarro faces or the

11  charge that he faces right now, and I won't belabor this point.

12       But, you know, this is a charge that was created

13  completely by the agents involved in this case.  It was

14  fictitious.  It was never going to happen.  It was created and

15  generated specifically for the purpose of getting a federal

16  charge against Miguel Pizarro, and nobody at any time was ever

17  actually in danger with regard to this.

18       So I think the Court should keep that in mind when

19  thinking about the nature of the charge and how that translates

20  to danger to the community.

21       The other incidents that were discussed by Agent

22  Blackman that in some way are tied to Miguel Pizarro involve a

23  couple of situations where he's actually a victim of violence,

24  and I understand the government arguing that simply because

25  he's around violence that that makes him a danger, but the idea

1   that somebody can be a victim and then that makes them a danger

2   to the community because they're a victim is surprising to me.

3   But that's the situation that Miguel Pizarro was in in two of

4   those circumstances.  In a third circumstance he was considered

5   to be a witness by the information that we have, if that,

6   because he heard gunfire.

7          There is an incident on November 30th of 2017 that

8   corresponds to a juvenile charge in the bond report that Miguel

9   Pizarro was adjudicated to be guilty of.  Again, this is back

10  in 2017, so three years ago.  That's accounted for and in the

11  bond report.

12         Otherwise the discussion that was just had between you

13  and Mr. Krug with regard to tying any of the weapons that were

14  involved to any shootings, you know, I would again just point

15  out that this is based on what the government is calling

16  preliminary testing.  They certainly wouldn't take preliminary

17  testing to trial.

18         And I would remind the Court that even final ballistic

19  testing by agencies that attempt to match ballistics to

20  firearms have been called into question by national studies.

21  Again, back in 2009 the National Academy of Science came to the

22  conclusion that tool mark and firearms identifications are

23  questionable and likely shouldn't be allowed in court at this

24  point, not unless there are better methods created.

25         And then again in 2016 the President's Council of

1   Advisors on Science and Technology came to the same conclusion,

2   that there are foundational validity questions and validity to

3   how these are applied for tool marks and firearms analysis.

4          And that's the final testing, and so what you have at

5   this point is a preliminary testing, and so I think that the

6   Court should not put virtually any weight on that in terms of

7   tying this type of behavior to Miguel Pizarro.

8          The other thing I would point out with regard to the

9   offense is that as testified, you know, the government states

10  that the fact that Mr. Pizarro had firearms is a concern.  His

11  possession and the sale apparently of those firearms wasn't a

12  violation of the law.  And so although I suspect it could raise

13  the Court's concern just because there is a firearm and that is

14  an issue for community safety, again, it isn't something that

15  was illegal.

16         With regard to Mr. Pizarro's risk of flight, I would

17  echo what Mr. Thomason pointed out earlier and that is that the

18  Tenth Circuit has told us if somebody has an immigration

19  detainer, that fact doesn't equate to a risk of flight because

20  for people like Mr. Pizarro that may have that detainer, if he

21  were to be taken away from this jurisdiction, it wouldn't be of

22  his own volition; it would be done by the executive branch of

23  this government, which is the same branch that's trying to

24  prosecute him now.  And there certainly is a way in which they

25  could coordinate with one another to make sure that doesn't

1   happen, so I don't think the Court should take that into

2   consideration when thinking about risk of flight.

3        In terms of Mr. Pizarro's prior juvenile

4   adjudications, he has two of those.  He did have some

5   difficulty with supervision to start with, but I would point

6   the Court to Mr. Pizarro's performance at the end of his

7   supervision.  From February 28th of 2018 to February 28th of

8   2019 Mr. Pizarro was put on intensive supervision as a juvenile

9   on both cases and he completed that supervision successfully.

10  So for a year, when he had intensive supervision, he actually

11  performed quite well and completed it successfully.

12       Now, our position is that pretrial services

13  supervision is similar to intensive supervision through the

14  state.  It's not something where Mr. Pizarro would just be

15  required to check in every once in a while.  He would have

16  conditions of release that he'd have to abide by.  And as

17  you're well aware, the pretrial services office would be

18  monitoring him to make sure that that occurs.  And if those

19  conditions needed to include something like house arrest or

20  electronic monitoring, we'd have no objection to that, and

21  that's certainly something the Court can consider.

22       But I think that we have a viable home plan in that

23  Miguel can reside with his father at 329 North 35th Street in

24  Kansas City, Kansas.  It gives him an opportunity to work.  If

25  you look at Miguel's history, you can see he's yet to obtain

1    his high school diploma or GED.  The Court could certainly --

2    and we would think that it might be smart -- to require Miguel

3    to engage in GED classes while he's on pretrial release so that

4    maybe he could obtain that before this case is resolved.

5            So based on all that, we do believe there are

6    conditions that this Court can set that would assure that

7    Mr. Pizarro would return to Court, would not flee, would abide

8    by conditions, and would assure that the community would be

9    safe.

10           THE COURT:  Thank you, Mr. Burdick.

11           Mr. Thomason.

12           MR. THOMASON:  Your Honor, I would join a lot of

13   arguments that Mr. Burdick made in regards to the evidence and

14   the use of NIBINs or firearm examination.  I think as the Court

15   pointed out, at least as it related to Brian Pizarro, no weapon

16   that he's alleged to have had has been tied to any other crime.

17           I would point, Your Honor, at least to the issue about

18   the safety of the community.  I believe the agent testified

19   that they, after purchasing the gun in this case, immediately

20   ran -- within days ran these checks.  It seems unusual that if

21   that occurred and one of these came back, that they themselves

22   didn't find them to be a danger as they continued to allow them

23   to be out.

24           I think that, as Mr. Burdick pointed out, it's a

25   fictitious crime even more so in the case of Brian.  He wasn't

1   present for any meeting or any sale of a firearm as the agent

2   testified and only came when he was asked -- his brother was

3   asked who do you trust more than anyone, and that was all at

4   the doing of the agents in this case about a fictitious crime.

5           The other issue I think, Your Honor, unless I'm

6   missing something, his prior -- only prior offense is a

7   juvenile offense, and although I see that there is a violation

8   of a conditional release, I don't see that they did anything

9   about that violation.  I don't see that they sent him back or

10  did anything other than notate that in the bond report.  In

11  fact, this case was discharged just several months after that.

12          The other issue, there's sure nothing in the court

13  records that I've been produced that indicate in any way that

14  he ever failed to appear or didn't follow that direction other

15  than the one notation on 2/24 of 2020 of a violation of

16  conditional release.

17          I think as the Court heard, Mr. Pizarro was the victim

18  of a crime.  He was shot.  He was charged as a juvenile with a

19  crime, and he served his time for that crime and that case was

20  discharged.

21          I think there is a verifiable home plan.  Whether it

22  be with the mother or the father, I think that's something that

23  the United States Probation Office can make a determination

24  about what they think the best scenario is there, but I do

25  think that release would be proper in this case.

1          I've already commented, Your Honor, I think on the

2     immigration issue, so I don't think I need to comment on that

3     again.  But I think under the facts and circumstances of this

4     case that pretrial detention is appropriate, that the Court

5     really should consider and I think there's a strong

6     consideration that people be released on pretrial unless

7     there's just absolutely no conditions that could be set.  I do

8     think the Court has the ability to set conditions of release

9     that would ensure not only the safety but also the appearance

10    of the defendant, Mr. Brian Pizarro, in this case.

11         Thank you, Your Honor.

12         THE COURT:  Thank you, counsel.

13         The Court has reviewed the pretrial services reports

14    on both of the defendants.  I had reviewed the complaint in

15    this case, and I have since reviewed the indictment in the case

16    and have listened intently to the testimony of Officer or Agent

17    Blackman as well as the arguments of counsel.

18         While I acknowledge the -- some of the concerns raised

19    by defense counsel, I find in the instance of both defendants

20    that by clear and convincing evidence that there's no condition

21    or combination of conditions I can impose that would ensure the

22    safety of any other persons in the community.

23         And there are a lot of reasons for that conclusion

24    that I could go through, but chief and foremost among them is

25    the -- are the statements made by Miguel and by Brian boasting

1    about killing other individuals in prior incidents; Miguel

2    giving information about the incident involving a situation --

3    in the 4400 block near KU where he's described an incident

4    where he shot this guy in the shoulder and kept shooting and

5    him being 6 feet under; acknowledging and boasting about

6    killing someone; and Brian, likewise, saying -- giving a

7    detailed account of how he had shot and caused someone to be

8    paralyzed, and shot and killed another individual, and then

9    even showed an article on his phone about the incident.

10          So these are detailed bits of information where these

11   two young men admitted, have said that they shot and killed and

12   paralyzed people.  And then on top of that, there are just

13   numerous facts that seem to show that there is not a very high

14   value placed on human life by these two young men, that they're

15   involved in violence.

16          I do recognize, and it's a point well taken, that I

17   can't conclude anything from when they've been victims, but

18   it's undisputed I think that they are involved in gang

19   activity.  They have been involved in activity where human life

20   has been put at risk, and they've admittedly been involved in

21   those sorts of activities.

22          And then although this entirely fictitious incident or

23   proposed murder for hire was presented, clearly there was no

24   plan really in place, it further illustrates these two young

25   men were gung-ho, it seems, to become involved in providing

1    weapons and murdering somebody for money, and there's strong

2    evidence of that, that that had numerous meetings and

3    participated in this.  And then at the time of their arrest,

4    there were firearms in the vehicle that they were in, so they

5    were ready to be involved in those sorts of activities.

6            So for all of those and other reasons that I won't

7    summarize right now on the record, I do find by clear and

8    convincing evidence that there's no condition or combination of

9    conditions of release that will reasonably assure the safety of

10   any other person in the community.

11           While I do have some flight risk concerns, especially

12   with regard to Miguel given his past track record, I'm not

13   basing my ruling today on that, and I'm certainly not basing my

14   ruling on the fact that they're not legally in the country

15   apparently.  I'm basing my ruling on that danger to the

16   community factor, which is further reenforced by the fact that

17   the probation office in the Western District recommended

18   detention as has our probation officer here in the District of

19   Kansas, and their recommendations were of detention.

20           And I also find that there's no release plan here that

21   gives me any comfort that the safety of the community would be

22   ensured if these two young men were released.

23           So for all those reasons, these two defendants will be

24   detained pending further hearing in this case.

25           My notes indicate that there is next set a status

1    conference for January 12th at 9:00 a.m., and that will be

2    before Judge Robinson.  I presume that will be also by video

3    conference.  I'm pretty sure that's the case, but counsel be in

4    contact with Bonnie and Judge Robinson's chambers to confirm

5    that.

6            Mr. Krug, anything further for today?

7            MR. KRUG:  Judge, I just wanted to let counsel know

8    that Detective Blackman has brought over discovery which is

9    being downloaded currently.  I think we have pretty much

10   everything except the -- I think we have the audios of each

11   transaction or interaction.  The videos themselves are being

12   redacted to protect the identity of the undercover, but those

13   are expected to get back to us pretty quick.  So we'll have

14   those disseminated shortly, Your Honor.

15           THE COURT:  Yes.  And that's a valid point, given that

16   I see some issues coming down the pike here in this case by

17   defense counsel, and so my admonition from the initial

18   appearance about the government's duty to provide and produce

19   exculpatory evidence is, I think, of extra importance in this

20   case, so I expect you to abide by that.  I know you will,

21   Mr. Krug.

22           MR. KRUG:  Yes, Your Honor.  Thank you.

23           THE COURT:  Anything further for today, Mr. Burdick?

24           MR. BURDICK:  Judge, I think maybe we should go ahead

25   and conduct an arraignment if that hasn't happened yet.

1          THE COURT:  Thank you, yes.  I forgot about that.

2          Are you ready to proceed with arraignment for Miguel

3   Pizarro today?

4          MR. BURDICK:  Yes, Judge, given that the charge is

5   identical to the complaint, we will waive a formal reading of

6   the indictment, and I will proffer a plea of not guilty on

7   behalf of Miguel Pizarro.

8          THE COURT:  Thank you.  And I will accept Miguel

9   Pizarro's not guilty plea, and that will be entered in the

10  record.

11         Mr. Thomason, anything further?

12         MR. THOMASON:  Your Honor, we have also reviewed the

13  complaint and as well now the indictment, which is the same

14  charge, and I would ask the Court to enter a plea of not guilty

15  for Brian Pizarro as well.

16         THE COURT:  And I will also accept Brian Pizarro's not

17  guilty plea, and that will be entered in the record as well.

18         I think that concludes our record for today.  Thank

19  you, counsel.  I appreciate your efforts.

20         Miguel and Brian Pizarro, you will remain in custody

21  there pending further hearing.  And as I noted, you will be

22  back in hearing before Judge Robinson on January 12th.

23         Thank you all.  We will be in recess.

24         (The proceedings were adjourned to January 12, 2021,

25  at 9:00 a.m.)

1           C E R T I F I C A T E

2       I, Danielle R. Murray, a Certified Court Reporter and the

3   regularly appointed, qualified, and acting official reporter of

4   the United States District Court for the District of Kansas, do

5   hereby certify that the foregoing is a true and correct

6   transcript from the stenographically reported proceedings in

7   the above-entitled matter.

8       SIGNED 28th of October, 2021

9

                        /s/Danielle R. Murray
10                       DANIELLE R. MURRAY, RMR, CRR
                        United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25